**IN THE**
**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**ROCK ISLAND DIVISION**

MARILYN R.,
        Plaintiff,

v.                                                            Case No. 4:18-cv-04098-SLD-JEH

COMMISSIONER OF SOCIAL
SECURITY,
        Defendant.

**Report and Recommendation**

Now before the Court is the Plaintiff's Motion for Summary Judgment (Doc. 10) and the Defendant's Motion for Summary Affirmance (Doc. 14).  This matter has been referred for a report and recommendation.  The Motions are fully briefed, and for the reasons stated herein, the Court recommends the Plaintiff's Motion for Summary Judgment be denied and the Defendant's Motion for Summary Affirmance be granted. [1]

**I**

Marilyn R. filed an application for disability insurance benefits (DIB) on November 8, 2016 and alleged disability beginning on May 7, 2015.  Her claim was denied initially on March 14, 2017 and upon reconsideration on August 7, 2017. Marilyn filed a request for hearing before an ALJ which was held on January 8, 2018.  At that hearing, Marilyn was represented by counsel and a vocational expert (VE) testified.  The ALJ issued an unfavorable Decision on January 30, 2018.  On March 27, 2018, the Appeals Council denied Marilyn's request for review, making

---

[1] References to the pages within the Administrative Record will be identified by AR [page number].  The Administrative Record appears as (Doc. 7) on the docket

the ALJ's Decision the final decision of the Commissioner.  Marilyn filed the instant civil action seeking review of the ALJ's Decision on May 29, 2018.

## II

At the hearing, Marilyn was 49 years old, divorced, and lived in an apartment with her 13-year-old son.  On her Form SSA-3368, Marilyn claimed the following conditions limited her ability to work:  major depression; suicidal ideation and attempts; fibromyalgia; lupus; and chronic fatigue.  AR 205.

Marilyn was first questioned by her attorney.  When asked whether her current weight was typical for her, Marilyn responded that her weight had gone up since her daughter committed suicide.  Marilyn took classes for gifted students in high school and graduated from high school.  She "tried" junior college but dropped out, and she took a medical transcription course and dropped out.  She said driving was "really hard on [her] upper shoulders.  [Her] shoulders and [her] neck."  AR 41.  She brought someone to the hearing with her because she was unsure about navigation and "tend[ed] to get confused."  *Id*.

Marilyn testified that she had trouble with steps as her legs became "very tired."  AR 42.  She did not have income beyond child support which was "spotty." *Id*.  She believed the last time she worked was in April 2016.  Her income in 2015 and 2016 was from housecleaning work she did with her ex-husband.  When asked whether that was full-time work of 40 hours a week, Marilyn responded, "No, not at all."  AR 43.  The last five jobs of eight she did in the past 15 years were done while she was mostly seated.  The others included more physical exertion.  When asked whether she could go back and do any of those past jobs, Marilyn said "[n]ot really" because of depression and "all of the pain that I deal with."  AR 44.

She testified that being overweight was not really a problem because she had been overweight for most of her adult life and "it never stopped me from being a unit clerk" or a CNA.  *Id*. at 44-45.  She affirmed that her weight had never

stopped her from doing physical work.  As for her lupus, Marilyn explained she was still able to do her work when first diagnosed about 13 years before the hearing.  She further explained that her lupus progressively became worse.  As of the hearing, "it's gotten so bad, that I'm just in constant pain.  And with – you know, doubled up with fibromyalgia.  I have the joint pain, and I have the muscle pain.  And I don't' – because I have Medicaid, I'm not getting the – medications that I need."  AR 46.  She said she had pain everywhere.  She slept in a recliner because she could no longer lay in a bed anymore.  Marilyn's attorney next asked: "You mentioned your fibromyalgia.  Are you able to separate out your symptoms and say well, this is lupus, and this is fibromyalgia?  Or do they just kind of run together?"  AR 47.  Marilyn answered, "I think they just run together."  *Id*.  Marilyn testified that her De Quervain syndrome presented in her right hand and she described its symptoms as causing her right middle finger (her dominant hand) to lock up.  It was a problem for her "all the time."  AR 48.  She testified to arthritis in her left hand.  She previously had bilateral carpal tunnel releases but was again starting to experience pain.

Marilyn's attorney next asked her questions about what she was able to do. Marilyn stated she could be on her feet, walking or standing, for between 20 to 30 minutes.  Upon sitting for a prolonged period of time she would have to shift because her hips would start to hurt.  Her attorney noted that Marilyn's doctor indicated Marilyn had to elevate her feet a lot.  Marilyn explained that was to help alleviate the pain in her back and edema.  She said she spent "[a]t least eight hours a day" with her feet up.  She could not give a fair idea of how far she thought she could walk before she needed a break, and then answered, "I tend to just keep walking till I drop."  AR 51.  She could lift a full gallon of milk if she kept it close to her body.  If she kept her right arm close to her body, she could "probably" lift ten pounds.  *Id*.  She said she had no grip strength at all; she had "a lot" of problems

3

with dexterity and did not have "pincher grip" and had a lot of hand cramping. AR 52.

As for her mental health issues, Marilyn confirmed that she suffered from major depressive disorder for "quite a while" and she "still [didn't] feel that there's any point in life . . . The only reason why [she was] still here is because [she didn't] want to leave [her] son alone."  AR 53.  She felt she was previously very intelligent but changes occurred due to two overdoses in the past.  "So I know I'm still smart. I mean, somewhere in there, there's something.  But I can't always recall things." AR 54.

As for what she did during the day, Marilyn testified she watched Netflix, played Trivia Crack on her phone (it hurt to hold her smartphone), and "very minimally" did housework.  AR 55.  She could manage vacuuming her apartment if she had a vacuum because the apartment was very small.  She cooked "[a]s little as possible" and was able to do the laundry with which her ex-husband helped her.  AR 56.  He also helped her carry things when she shopped.  She tried to go to church each Sunday.  She testified it was painful when she brushed her teeth and her hair.

The VE was then questioned.

### III

In his Decision at Step Two, the ALJ determined Marilyn had the following severe impairments:  lupus; major depressive disorder (MDD); and obesity.  AR 17.  The ALJ explained that all the other impairments Marilyn alleged were not severe under the Social Security Administration regulations because they had no more than a minimal effect on her ability to work, had not lasted or were not expected to last at least twelve months, nor were they expected to result in death. At Step Three, the ALJ noted Marilyn's mental status examinations did not routinely demonstrate serious deficits or abnormalities in her memory, thought

4

content, goal-direct thought process, recall, or cognitive functioning.  AR 19.  He also noted Marilyn's treatment notes did not "reflect significant noted difficulties following through with medical advice or a treatment regimen due to memory functioning, minimal insight, or other supportive mental status examinations."  *Id*.  The ALJ discussed that Marilyn reported no problems getting along with family, friends, neighbors, or others "but stated she was more reclusive and [did] not want to go out alone."  *Id*.  She reported she could spend time with others when she went to church, to Temple, shopping, and appointments.  The ALJ explained Marilyn's ability to drive a car indicated she was capable of operating a motor vehicle, attending to her surroundings, and navigating simultaneously and independently.  The ALJ further explained that Marilyn's treatment notes did not reflect significant noted difficulties with performing simple calculations, staying on task during her examinations, or maintaining a conversation with an examiner.  AR 20.  The ALJ highlighted the record did not reflect any significant abnormalities in Marilyn's hygiene or appearance, including her treatment notes which did not reflect significant diminished hygiene, recurrent conflicts with medical staff, or the inability to adapt to changes.  *Id*.  Also, her "mental status examinations did not routinely demonstrate serious deficits or abnormalities in her orientation, appearance, judgment, insight, psychomotor activity, speech, hallucinations, suicidal ideation, or homicidal ideation."  *Id*.

At Step Four, the ALJ made the following residual functional capacity (RFC) finding:

> [T]he claimant has the [RFC] to perform light work as defined as:  can no more than occasionally lift or carry up to twenty pounds; can no more than frequently lift or carry up to ten pounds; can sit for no more than six hours total in an eight-hour workday; can stand or walk for no more than six hours total in an eight-hour workday; can no more than occasionally climb ramps or stairs; can no more than occasionally stoop, kneel, crouch, or crawl; has the cognitive ability to remember

general work procedures, and retains the capacity to understand and remember multi-step instructions; has attention and concentration necessary to persevere and complete those operations for the time periods expected in the work force; retains the capacity to maintain a schedule and be on time; would need only common supervision; has the pace and endurance necessary to fulfill a normal workday and week on a consistent basis, to perform at a consistent acceptable rate, and would require only common numbers and lengths of rest breaks; has lowered social tolerance but can relate appropriately in socially undemanding settings with low stress demands that require only brief superficial interactions and with reduced interpersonal contact away from the general public; retains the capacity to adapt to simple changes in daily routines, and the capacity to be aware of and self-protective of common hazards; and retains the capacity to utilize public transportation to and from a place of work.

AR 21.  In making that finding, the ALJ considered Marilyn's testimony, her December 2016 Adult Function Report, her treatment by a rheumatologist, her February 2017 visit to an orthopedist, her "regular treatment" with Mental Health Centers of Western Illinois, her prior work record, her activities of daily living, and her GAF scores of record. The ALJ additionally discussed the objective medical evidence, a January 2017 physical consultative examination (CE) with Raymond Leung, M.D., a January 2017 psychological CE with Angela Lew, Ph.D., State Agency doctors Linda Lanier, Ph.D., Richard Lee Smith, M.D., Joseph Mehr, Ph.D., and Michael Nenaber, M.D.'s opinions, and treating nurse practitioner Tracey Burgard's opinions.

After he presented Marilyn's hearing testimony, the ALJ explained that he first turned to the objective medical evidence.  He began:

The claimant's pattern of treatment, physical examinations, and diagnostic imaging are consistent with an individual who is experiencing some symptoms that would be expected to cause slight limits with weakness and manipulations consistent with a range of light exertional work but does not reflect frequent, escalating, or intense treatment, extreme structural abnormalities, or objective

>clinical signs indicative of functional deficits beyond medium
>exertional effort. The claimant's pattern of treatment predominantly
>reflects only primary care provider treatment with some halting
>treatment with specialists but no coherent escalating pattern of
>treatment.

AR 22-23. With regard to rheumatologist Dr. Mark Stern, the ALJ pointed to Dr. Stern's May 2015 note which questioned Marilyn's "diagnosis and multiple drug combinations without clear necessity." AR 23. The DNA test he performed for very active forms of lupus was found to be normal. The ALJ noted the record did not reflect any significant follow up with Dr. Stern or other significant rheumatology treatment. The ALJ did acknowledge that Marilyn saw her primary care provider "on approximately a monthly basis" and simultaneously noted treatment notes from her primary care provider reflected "intermittent and episodic complaints with the claimant jumping between various complaints without a coherent escalating pattern of treatment, supportive objective testing, or supportive diagnostic imaging." *Id.*

The ALJ next discussed consultative examiner Dr. Leung's examination results which indicated, among other things, Marilyn had a slight limp, stiff gait, limited straight leg raises, diffuse tenderness, and decreased range of knee motion but also full range of motion across all other planes, no muscle atrophy, no spasms, full pinch strength, full grip strength, full arm and leg strength, normal sensation, no lower extremity edema, and the ability to walk 50 feet unassisted. The ALJ determined the objective medical evidence pertaining to Marilyn's physical issues supported that she had some generalized pain and fatigue and reflected that her alleged conditions were genuine but that same evidence also reflected mild or moderate diagnostic imaging findings and minimally supportive clinical signs.

As for her mental impairments, the ALJ noted several diagnoses were included in the record but the severity Marilyn alleged was not supported in the medical records. The ALJ stated:

> As a threshold matter, the undersigned is cognizant of the substantial overlap in symptomology between different mental impairments, as well as the inherently subjective nature of mental diagnoses. Accordingly, the claimant's psychological symptoms and their effect on her functioning have been considered together, instead of separately, regardless of the diagnostic label attached.

AR 24. The ALJ pointed out that Marilyn's sustained significant treatment for her mental health did not begin until May 2015, and at that time she was seen in an emergency room for a suicide attempt related to her daughter's suicide attempt. He included Marilyn was treated with group therapy, psychoeducation, a crisis intervention plan, medication management, therapy, and case management treatment. He highlighted that throughout her treatment at Mental Health Centers of Western Illinois, Marilyn was routinely diagnosed with MDD "only." *Id*. The ALJ next acknowledged that Marilyn's treatment increased around the time of her daughter's suicide in August 2015, but her treatment pattern did not reflect significant symptom exacerbations or worsening. At her psychological consultation with Dr. Lew, Marilyn's mental status examination revealed an anxious and depressed mood but no noted indications of significant abnormalities in a variety of areas. The ALJ determined the objective medical evidence of Marilyn's mental health treatment did reflect she had some problems with mental symptoms that would reduce her ability to perform work activities but did not reflect such a loss of ability that she was limited beyond those limitations set forth in the RFC finding.

With regard to Marilyn's subjective complaints, the ALJ first explained that they were to be discounted if there were inconsistencies in the evidence as a whole,

and he cited the regulations and Social Security Ruling that guided his inquiry in that regard.

As for the opinion evidence, the ALJ gave "greater weight" to State Agency Drs. Lanier, Smith, Mehr, and Nenaber's opinions. He gave "partial weight" to consultative examiners Lew's and Leung's examinations. He gave "partial weight" to treating Nurse Practitioner Burgard's opinions. The ALJ noted she was not an acceptable medical source but her opinion could be considered to show the severity of Marilyn's impairments, and so the ALJ considered her opinions with respect to severity and effect on function. The ALJ further noted that Marilyn's pattern of treatment by Burgard was "generally conservative without escalating modalities and her examinations of the claimant do not fully support the opined limitations." AR 27. He concluded that Burgard's opined-to more restrictive limitations for Marilyn were "not fully supported by her treatment notes, her objective testing, or her pattern of treatment of the claimant." *Id*. "These inconsistencies reduce the persuasiveness of her opinions." *Id*. Finally, the ALJ gave "little weight" to Marilyn's GAF scores for several expressed reasons.

## IV

Marilyn argues three errors: 1) as a matter of law, the agency denial which is the final agency action, the ALJ's unfavorable decision, is not valid and must be vacated because the ALJ was not properly appointed and therefore lacked legal authority to decide the case; 2) in determining Marilyn's RFC, the Defendant's ALJ did not follow correct legal standards evaluating expert medical opinion evidence, and as a result, her decision is not supported by substantial evidence in the record as a whole, and is actually inconsistent with the record evidence; and 3) the Defendant's ALJ failed to credit Marilyn's statements, including sworn statements, and did not explain good reasons.

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971), *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for disability. *See* 20 C.F.R. § 404.1566. The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). The factual determination is made by using a five-step test. *See* 20

C.F.R. § 404.1520. In the following order, the ALJ must evaluate whether the claimant:

1) currently performs or, during the relevant time period, did perform any substantial gainful activity;

2) suffers from an impairment that is severe or whether a combination of her impairments is severe;

3) suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;

4) is unable to perform her past relevant work which includes an assessment of the claimant's residual functional capacity; and

5) is unable to perform any other work existing in significant numbers in the national economy.

*Id.* An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. *Tom v. Heckler*, 779 F.2d 1250 (7th Cir. 1985); *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).

In the instant case, Marilyn claims the ALJ lacked legal authority to decide the case in the first instance, and, moreover, the ALJ erred in his Decision at Step Four.

## A

Marilyn first argues that the ALJ's Decision must be vacated because the ALJ was not properly appointed and therefore lacked the legal authority to decide the case.  Marilyn's argument relies upon the United States Supreme Court's decision in *Lucia v. SEC*, 138 S. Ct. 2044 (2018), in which the Supreme Court held the Securities and Exchange Commission's ALJs are "Officers of the United States" subject to the Appointments Clause of the Constitution and reiterated its holding in *Ryder v. United States* that "one who makes a timely challenge to the constitutional validity of the appointment of an officer who adjudicates his case" is entitled to relief.  *Lucia,* 138 S. Ct at 2055, *quoting Ryder*, 115 S. Ct. 2031 (1995).  The Commissioner argues Marilyn's failure to raise her Appointments Clause challenge at any point in the administrative process forfeits her claim.

As an initial matter, the Court notes that there is a difference between "waiver" and "forfeiture."  The various cases that have dealt with the question currently before the Court have used the terms interchangeably.  "Waiver occurs when a party intentionally relinquishes a known right and forfeiture arises when a party inadvertently fails to raise an argument in the district court."  *United States v. Flores*, -- F.3d --, No. 18-3249, 2019 WL 2847453, at *3 (7th Cir. July 3, 2019).  Here, the parties appear to agree that Marilyn *forfeited* her challenge to the ALJ's appointment in her case.  However, the parties do not provide what the appropriate framework would be for a forfeiture analysis in a case such as this.  In *Jackson v. Parker*, the Seventh Circuit Court of Appeals explained:

> "In civil litigation, issues not presented to the district court are normally forfeited on appeal." *Russian Media Group, LLC v. Cable Am., Inc.*, 598 F.3d 302, 308 (7th Cir.2010). If the interests of justice require, we may consider the forfeited argument, "but it will be a 'rare case in which failure to present a ground to the district court has caused no one—not the district judge, not us, not the appellee—any harm of which the law ought to take note.' " *Id.* (quoting *Amcast Indus. Corp.*

12

> *v. Detrex Corp.*, 2 F.3d 746, 749–50 (7th Cir.1993)). As such, while the plain error doctrine is often applied in criminal cases, it is rarely applied in civil cases. *Moore ex rel. Estate of Grady v. Tuleja*, 546 F.3d 423, 430 (7th Cir.2008). "Plain error is only available in civil cases if a party can demonstrate that: (1) exceptional circumstances exist; (2) substantial rights are affected; and (3) a miscarriage of justice will occur if plain error review is not applied." *Id*.

627 F.3d 634, 640 (7th Cir. 2010). Because Marilyn has not argued for plain error review, she has waived that argument. Had she not waived that argument, plain error is not available to her in this case in any event because she cannot demonstrate any of the three requirements set forth above.

First, exceptional circumstances do not exist where there remains the possibility that the Court could remand the case to an ALJ whose appointment has since been ratified by the Acting Commissioner of Social Security and whose appointment has been approved as the Acting Commissioner's own. Second, substantial rights are not affected where the Court will proceed to consider the merits of the parties' arguments for and against reversing the ALJ's Decision. Third, a miscarriage of justice will not occur if plain error review is not applied. Marilyn initially obtained review of her DIB claim, exercised her ability to obtain further review at the various levels, and was not prevented from filing this case in federal district court.

Because Marilyn has forfeited her challenge to the ALJ's lack of appointment and that challenge is not subject to plain error review, the Court next addresses the substance of the ALJ's Decision.

### B

### 1

While Marilyn concedes that errors at Step Two may be harmless, she insists the errors the ALJ allegedly committed at Step Two in this case caused the RFC at

Step Four to be deficient and unsupported.  She specifically takes issue with the ALJ's conclusion that Marilyn's chronic fatigue "would overlap and coincide with the claimant's lupus symptoms, such that any limitations would already be accounted for and would not be beyond those already in the determined residual functional capacity," and she faults the ALJ for failing to provide medical evidence to support the lack of severity attributable to her fibromyalgia.  AR 18.  While the Commissioner does not specifically address Marilyn's arguments as to the ALJ's statements at Step Two, the Commissioner maintains substantial evidence supports the ALJ's RFC finding and the weight he gave to the medical source opinions and other evidence.

At Step Two of his Decision, the ALJ articulated that Marilyn's fibromyalgia, chronic fatigue, carpal tunnel syndrome, back pain, De Quervain syndrome, and edema did not cause more than minimal vocationally relevant limitations and were therefore not severe.  With regard to fibromyalgia, the ALJ stated:

> In considering the claimant's fibromyalgia, the undersigned notes the claimant has been diagnosed with fibromyalgia by a primary care provider but the record only reflects partial findings of the claimant's widespread pain, tender points, or fibromyalgia symptoms, signs, or co-occurring findings.  More importantly, the medical record of evidence does not reflect sufficient evidence that other disorders that could cause the claimant's alleged symptoms or signs were excluded.

AR 18.  The ALJ also articulated that any functional limitations potentially caused by Marilyn's chronic fatigue "would overlap and coincide with the claimant's lupus symptoms, such that any limitations would already be accounted for and would not be beyond those already in the determined residual functional capacity."  *Id*.  Finally, the ALJ stated in consideration of Marilyn's alleged carpal tunnel syndrome, back pain, De Quervain syndrome, and edema, Marilyn had been diagnosed with those conditions but the medical evidence of record reflected

14

that she received "only infrequent conservative treatment with minimal supportive clinical signs and only limited complaints, which support[ed] that those conditions would not cause more than a minimal effect on her ability to work." *Id.*

"Step two is merely a threshold inquiry; so long as one of a claimant's limitations is found to be severe, error at that step is harmless." *Ray v. Berryhill*, 915 F.3d 486, 492 (7th Cir. 2019). That is so because "[e]ither way, the ALJ must later consider the limitations imposed by all impairments, severe and non-severe." *Id*. Regardless of how Marilyn attempts to frame her argument or what the ALJ said at Step Two, any error the ALJ committed at that step was harmless where he proceeded to consider the combined effects of all of Marilyn's impairments at Step Four. The ALJ did *not* ignore those impairments altogether. *See Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) (stating that although certain impairments may not on their own be disabling, "that would only justify discounting their severity, not ignoring them altogether" and an ALJ must "consider the combined effects of all of the claimant's impairments, even those that would not be considered severe in isolation"). At Step Four, the ALJ noted Marilyn's testimony that her fibromyalgia and lupus symptoms overlapped and she herself had difficulty differentiating their respective symptoms. He also considered the objective medical evidence, Marilyn's subjective statements, and the opinion evidence of record to determine the true extent of Marilyn's limitations caused by her impairments. *See Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015), *quoting Yurt v. Colvin*, 758 F.3d 850, 856 (7th Cir. 2014) ("[T]he ALJ's RFC assessment must incorporate all of the claimant's *limitations supported by the medical record*") (emphasis added). In his discussion of the record evidence (as analyzed more fully below), the ALJ made clear why he included the limitations that he did in Marilyn's RFC but omitted further alleged limitations due to her impairments. *See*

15

*Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (stating that an ALJ must "sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence . . . and to enable us to trace the path of the ALJ's reasoning").

**2**

Marilyn challenges the ALJ's consideration of the medical opinions on the basis that all of the reasons the ALJ gave for giving the State Agency doctors more weight were not true and not valid reasons. The Commissioner argues the ALJ reasonably assessed the factors an ALJ must consider when making an RFC finding – all relevant evidence including objective medical evidence, treatment, physicians' opinions and observations, and the claimant's own statements about her limitations – such that his Decision reasonably reflected the path of his reasoning.

The one argument Marilyn makes in this regard which gives the Court pause is that the ALJ failed to mention or discuss the August 21, 2015 opinion provided by Marilyn's treating Dr. Wesp. The Commissioner argues that the ALJ's failure to do so was at most a harmless error where State Agency Dr. Nenaber's opinion (whose opinion was given "greater weight") provides a basis for tracing the path of the ALJ's reasoning in that it explained reasons for giving less weight to Dr. Wesp's opinion. 20 C.F.R. § 404.1527(c) provides[2]:

> How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

---

[2] The SSA revised its rules for evaluating medical evidence and medical opinions but those changes do not apply to this case because Marilyn's application was filed before the effective date of those revisions of March 27, 2017.

16

The listed factors include: 1) examining relationship; 2) treatment relationship, which in turn includes length of the treatment relationship and the frequency of examination, and the nature and extent of the treatment relationship; 3) supportability; 4) consistency; 5) specialization; and 6) other factors brought to the Social Security Administration's attention. *Id.* Though an ALJ must give controlling weight to the medical opinion of a treating physician, the ALJ must do so only if the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008), *citing Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006); 20 C.F.R. § 404.1527(c)(2).

The Court agrees with the Commissioner that the failure to mention Dr. Wesp's August 2015 opinion was harmless error. "If it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, then remanding is a waste of time." *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). Here, the ALJ made very clear that he gave Dr. Nenaber's opinion "greater weight" because it was "particularly consistent with [Marilyn's] conservative pattern of treatment with[out] escalating modalities and [Marilyn's] minimally supportive physical examinations." AR 26-27. Elsewhere in his Decision, the ALJ discussed the medical evidence provided by Marilyn's primary care providers between June 2015 and December 2017 (which included records from Dr. Wesp) and relied upon the fact that her physical examinations included in that evidence were "unremarkable or demonstrated only left leg limp and slowed gait with no other significant noted recurrent musculoskeletal or neurological defects." AR 23. The ALJ later stated Dr. Nenaber's opinion deserved greater weight because it was "generally consistent with the medical record of evidence as a whole." AR 26. Also, Dr. Nenaber's

August 2017 opinion cited Dr. Wesp's treatment records among others in support of his conclusions.

Finally, as the Commissioner points out, Dr. Nenaber noted Dr. Wesp's August 2015 physical RFC assessment that Marilyn was capable of only sedentary work and that some consideration was given to that opinion, but the opinion was almost two years old, Dr. Wesp later noted in December 2016 that Marilyn's condition was stable and non-progressive, that her primary complaints at that time included headaches and facial rash, and at the January 2017 physical CE, Marilyn reported she could walk up to half a mile and lift 20 pounds. Given the ALJ's supported conclusion (see discussion below) that Marilyn's medical records did not support further limitations than those set forth in the RFC finding, the ALJ's express determination that Dr. Nenaber's opinion was consistent with the medical evidence as a whole, and the reasons Dr. Nenaber gave for providing Dr. Wesp's August 2015 opinion only "some consideration," the Court is convinced the ALJ would reach the same result on remand. *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) (explaining that administrative error may be harmless and thus a court ought not remand a case to the ALJ where it is convinced that the ALJ would reach the same result).

As for Marilyn's other arguments pertaining to the ALJ's consideration of the medical opinions, they amount to nitpicking. Marilyn argues:

> As for the DDS opinions being consistent with the CE opinion, that would not actually be supportive of the ALJ's mental RFC since, as the ALJ himself said, the mental CE did not provide any opinion as to the severity of Plaintiff's mental limitations of functioning.

Plf's MSJ (Doc. 11 at pg. 12). She argues further:

> The CE opinions gave no opinions regarding RFC, the DDS doctors believed that they needed the CEs because there was not enough evidence to make a decision without them. So finally the DDS doctors

expressed opinions absent sufficient evidence, and the ALJ has adopted those opinions as his own.

*Id.* at pg. 13. Marilyn's argument misses the mark. In his Decision, the ALJ pointed out that Drs. Lanier, Smith, Mehr, and Nenaber (the State Agency doctors) were well versed in the Social Security Act and regulations, "including all pertinent definitions and procedures utilized by the Social Security Administration in determining whether an individual is entitled to disability insurance benefits[.]" AR 26. He continued:

> Although Drs. Lanier, Smith, Mehr, and Nenaber were non-examining, and therefore their opinions do not as a general matter deserve as much weight as those of examining or treating physicians, their opinions do deserve greater weight, since their opinions are generally consistent with the medical record of evidence as a whole.

*Id.* He explicitly stated that the State Agency doctor's opinions regarding Marilyn's mental impairments were consistent with Dr. Lew's[3] *examination*.[4] Specifically with regard to the CEs of record, the ALJ explained the consultative examiners Drs. Lew and Leung "administered thorough examinations of the claimant and provided diagnoses" though they did not provide specific opinions regarding Marilyn's degree of limitation in relevant functioning areas and did not "specifically provide statements that reflect[ed] their judgments about the nature and severity of [Marilyn's impairments, what [she] could still do despite her impairments, and her physical or mental restrictions." AR 27. The ALJ concluded,

---

[3] As the Commissioner notes in the Motion for Summary Judgment, the ALJ incorrectly referred to Dr. Lew's CE as coming from a "Dr. Taiwo."

[4] Contrary to Marilyn's argument, the ALJ made no such determination that the State Agency doctors' opinions were consistent with the consultative examiners' opinions (which the ALJ acknowledged were not provided). Instead, the ALJ considered the consultative examiners' *examinations* and determined those were entitled to partial weight when considered together with the rest of the relevant evidence.

"However, Drs. [Lew] and Leung's examination have considered [sic] together with the rest of the relevant evidence and are given partial weight." *Id*.

As set forth above, an ALJ is tasked to consider various factors when deciding the weight to give medical opinions. Here, the ALJ articulated his reasons for assigning the State Agency doctors' opinions "greater weight" and, in doing so, showed that he complied with 20 C.F.R. § 404.1527. *See Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002) (an ALJ's decision must be sufficiently articulated to allow for meaningful review). The Court also notes that the CEs are dated January 13, 2017 and January 28, 2017, whereas the State Agency doctors' opinions are dated February 25, 2017, March 10, 2017, July 25, 2017, and August 2, 2017. Clearly, the State Agency doctors had the benefit of additional evidence – the consultative examinations – when they made their own determinations. Marilyn's bald assertion that the State Agency doctor's "expressed opinions absent sufficient evidence" is contradicted by the record.

Marilyn attempts to show the ALJ improperly credited the State Agency doctors with knowledge of the Social Security Act and regulations, etcetera where Dr. Lanier failed to obtain a different consultative examiner in accordance with 20 C.F.R. § 404.1519j (Objections to the medical source designated to perform the consultative examination). Marilyn objected to the consultative examiner because she was scheduled to meet with him pertaining to her child custody case and implied she had a different set of responses to questions depending upon which case they were for. AR 73. Marilyn's attempt fails. "It is appropriate for an ALJ to rely on the opinions of physicians and psychologists who are also experts in social security disability evaluation." *Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004). The fact that Dr. Lanier did not obtain a different consultative examiner does not definitively show Dr. Lanier was not "as knowledgeable about the regulations . . . as the ALJ assumed [she] was." Plf's MSJ (Doc. 11 at pg. 13).

Indeed, Marilyn's statement that the medical source designated to perform the CE should have been replaced pursuant to § 404.1519j does not make her position true on its face. She does not argue the details, and the Court will not make her argument for her.

C

Finally, Marilyn argues the ALJ failed to credit her statements and used words that did not convey substantial evidence to support a denial of disability. The Commissioner counters that the ALJ's evaluation of Marilyn's symptoms was not patently wrong where he reasonably considered the appropriate regulatory factors when he evaluated the impact of Marilyn's symptoms.

SSR 16-3p directs the ALJ to focus on the "intensity and persistence of the applicant's symptoms." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016). SSR 16-3p provides that all the evidence, including objective medical evidence, is to be considered in evaluating the intensity, persistence, and limiting effects of an individual's symptoms and also the factors set forth in 20 C.F.R. § 404.1529(c)(3) are to be considered including: the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; medications and their side effects; non-medication treatments; any other measures used to relieve pain or other symptoms; and any other factors concerning the claimant's functional imitations and restrictions due to pain and other symptoms. SSR 16-3p, at *7-8.

The ALJ explained in his Decision:

[He] also [gave] full consideration to all of the evidence presented relating to subjective complaints, including [Marilyn's] prior work record, and observations by third parties and treating and examining physicians relating to such matters: the claimant's daily activities; the duration, frequency, and intensity of the pain; precipitating and aggravating factors; dosage, effectiveness, and side effects of

medication; treatment, other than medication, for relief of pain; and functional restrictions.

AR 25.  While it is true, as Marilyn points out, that the ALJ said relevant pieces of evidence suggested her symptoms "may" not be accurately reported, "may" not exist at the level of severity assumed by the claimant's testimony at the hearing, and "may" have other mitigating factors against their negative impact on her ability to engage in work, the ALJ set forth the reasons in no uncertain terms why he discounted the intensity, persistence, and limiting effects of Marilyn's symptoms as alleged by her.

The ALJ explained that although Marilyn's prior work record was not a determinative factor, "her sporadic work and poor earnings [did] not support [her] allegations that except for her impairments she would be working."  AR 25. The ALJ next explained that Marilyn's self-reported activities of daily living were inconsistent with her allegations of disability.  The ALJ concluded, "Based upon the totality of the evidence, the claimant has engaged in substantial activities of daily living; the performance of which are inconsistent with her complaints of disabling symptoms and limitations, but are consistent with the determined {RFC]."  AR 26.  The ALJ also explained that Marilyn's medical treatment was inconsistent with her statements concerning the intensity, persistence, and limited effects of her symptoms.  He noted her treatment had been "essentially routine or conservative in nature," the record did not reflect "escalating treatment modalities," and "conservative treatment [had] been relatively effective at controlling her symptoms."  AR 26.  While Marilyn faults the ALJ for considering the *lack* of certain types of treatment, such a fact was fair game where the ALJ was to consider her medications and their side effects, non-medication treatments, and any other measures used to relieve pain or other symptoms.  *See* 20 C.F.R. § 404.1529(c)(3); *and* SSR 16-3p.  The ALJ built a logical bridge between the evidence

and his conclusion that Marilyn's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but her statements concerning the intensity, persistence, and limiting effects of those symptoms was not "entirely consistent with the medical evidence and other evidence in the record[.]" AR 26; s*ee Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("an ALJ need not mention every piece of evidence, so long he builds a logical bridge from the evidence to his conclusion"). Marilyn's argument amounts to a request for the Court to reweigh the evidence relevant to the ALJ's assessment of her subjective allegations. The Court cannot and will not do so. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (explaining that in reviewing an ALJ's decision, the court cannot reweigh evidence, resolve conflicts in the record, decide questions of credibility, or otherwise substitute its own judgment for that of the Commissioner).

## V

For the reasons set forth above, it is recommended that: 1) the Plaintiff's Motion for Summary Judgment (Doc. 10) be denied; 2) the Defendant's Motion for Summary Affirmance (Doc. 14) be granted; 3) The Clerk of Court be directed to enter judgment as follows: "IT IS ORDERED AND ADJUDGED that the decision of the Defendant, Nancy A. Berryhill, Acting Commissioner of Social Security, denying benefits to the Plaintiff, Marilyn R., is AFFIRMED."; and 4) this matter be terminated.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk within fourteen (14) days after service of this Report and Recommendation. FED. R. CIV. P. 72(b)(2); 28 U.S.C. § 636(b)(1). Failure to object will constitute a waiver of objections on appeal.

*Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

*It is so recommended.*

Entered on July 16, 2019.

<u>s/Jonathan E. Hawley</u>
U.S. MAGISTRATE JUDGE